# UNITED STATES DISTRICT COURT

### for the
### Northern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.    5:23-MJ-723 (ATB) |
| An Apple I-Phone 15 and sim card bearing number 8901260208711270357329.00 located at 45764 Landon Road, Wellesley Island, NY 13640 | ) ) ) ) | |

U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Dec 07 - 2023**

John M. Domurad, Clerk

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Northern District of New York, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324 | Bringing in or harboring certain aliens |

The application is based on these facts:

See attached affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of ___ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Peter T Lombardi* ◇ ◇

*Applicant's signature*

Peter T. Lombardi, II
Border Patrol Agent - Intelligence

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone *(specify reliable electronic means)*.

Date:    December 7, 2023

*Judge's signature*

City and state:    Syracuse, New York

Hon. Andrew T. Baxter, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION FOR A SEARCH WARRANT**

I, Peter T. Lombardi II, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of one Apple I-phone 15 (hereinafter "the Device") and a sim card bearing number 8901260208711270357329.00, which are currently in the custody of U.S. Border Patrol at 45764 Landon Road, Wellesley Island, NY 13640, for the purpose of identifying electronically stored data particularly described in Attachment B (*i.e.*, authorizing a search for evidence and instrumentalities of violations of 8 U.S.C. § 1324(a)(1)(A)(ii) (transportation or movement of aliens within the United States), (a)(1)(B)(i) (conduct for purpose of commercial advantage or private financial gain), (a)(2) (bringing an alien to the United States), (a)(2)(B)(ii) (conduct for purpose of commercial advantage or private financial gain)).

2.      I am a Border Patrol Agent-Intelligence (BPA-I) with the United States Department of Homeland Security (DHS), Bureau of Customs and Border Protection (CBP), United States Border Patrol (USBP), Buffalo Sector Intelligence Unit and assigned to the Wellesley Island Border Patrol Station. I have been a Border Patrol Agent since February 2019. My primary duty is to assist in the prevention of illicit trafficking of people and contraband between the official ports of entry. My authority to perform this mission is articulated in the Immigration and Nationality Act, sections 235 and 287, and Title 8 U.S.C. Section 1357. These bodies of law relate to, among other things, a Border Patrol Agent's authority to interrogate any alien or person believed to be an alien, and to make an arrest of any alien who is entering or attempting to enter the United States in violation of the immigration laws. To enforce these laws, I have received

training at the Federal Law Enforcement Training Center in Artesia, New Mexico in Law, Operations, Firearms, Driving Techniques, and Physical Techniques.

3.      I have investigated violations of the Immigration Nationality Act (INA) including illegal entry of aliens in violation of Title 8, United States Code, Section 1325, and the smuggling of aliens in violation of Title 8, United States Code, Section 1324. I have written and executed search warrants for electronic devices and have reviewed the evidence contained within.  I have analyzed data and information from electronic devices and presented that data as evidence during criminal investigations.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## PROBABLE CAUSE

5.      On December 2, 2023, the Honorable Andrew T. Baxter signed a criminal complaint charging Sergio Eduardo Aguirre-Soto with a violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii). A copy of the complaint and supporting affidavit is attached hereto as **Exhibit 1**, and the facts in the affidavit are incorporated herein by reference.

6.      The Device was seized from Aguirre-Soto incident to his arrest and, therefore, was with him during the offense conduct. Right before the Device was seized, Aguirre-Soto turned it off. Because the Device was turned off at the time of seizure, investigators could not put the Device in airplane mode. Accordingly, to ensure that if/when the Device is powered on for purposes of executing a search warrant, the sim card was removed to prevent the possibility of remote data deletion when the Device is powered-on. The Device and sim card are currently being held at a Border Patrol facility located at 45764 Landon Road, Wellesley Island, NY 13640.

7.      I know from my training and experience, including my involvement in multiple similar alien smuggling events, that individuals involved in alien smuggling rely heavily upon their cellular telephones to commit the offense and that evidence of their commission of the offenses is routinely found on such devices. For example, smugglers use cellular telephones to arrange the crossing from Canada into the United States, coordinate pickups, and communicate with coconspirators with respect to the foregoing. It is common for such individuals to use applications on the cellular telephone that use GPS data for location information, messaging applications to communicate, and camera applications to take/share photographs of locations relevant to the smuggling event. I also know from my training and experience that sim (Subscriber Identity Module) cards are integrated circuits intended to securely store an international mobile subscriber identity (ISMI) number and related keys to authenticate subscribers on mobile telephones and that such cards can store data related to the cellular telephone.

8.      The Device and sim card are currently in the lawful possession of the United States Border Patrol and has been since on or about December 1, 2023. I seek this warrant to be certain that further examination of the Device and sim card will comply with the Fourth Amendment and other applicable laws.

**<u>TECHNICAL TERMS</u>**

9.      Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless

telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.   Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.   Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless

5

communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

10. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

11. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

12.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.   I know that when an individual uses an electronic device to facilitate an alien smuggling crime, that device will generally serve as both an instrumentality for committing the crime and as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device also is likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

13.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant. The examination will be performed by representatives from the Department of Homeland Security and their designees.

14.   *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

15.       I submit that this affidavit supports probable cause for the requested warrant.

Attested to by the applicant by telephone in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

*Peter T Lombardi* 𝒜𝒜
_____
Peter T. Lombardi, II
Border Patrol Agent – Intelligence

I, the Honorable Andrew T. Baxter, United States Magistrate Judge, hereby acknowledge that this affidavit was attested by the affiant by telephone on December ___7___, 2023, in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Andrew T. Baxter
United States Magistrate Judge

Exhibit 1

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of New York

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | |
| | ) | Case No.   5:23-MJ-711 (ATB) |
| **Sergio Eduardo AGUIRRE-Soto,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Dec 02 - 2023**

John M. Domurad, Clerk

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the date(s) of December 2, 2023, in the county of Jefferson in the Northern District of New York the defendant violated:

|  *Code Section* |  *Offense Description* |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(ii) | Alien smuggling |

This criminal complaint is based on these facts:

☒   Continued on the attached sheet.

_____
*Complainant's signature*

Border Patrol Agent Gerard A. Spinner
_____
*Printed name and title*

Attested to by the affiant in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Date:   December 2, 2023
_____

_____
*Judge's signature*

City and State:   Syracuse, New York

Hon. Andrew T. Baxter, U.S. Magistrate Judge
_____
*Printed name and title*

*United States of America v. Sergio Eduardo AGUIRRE-Soto*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Gerard, A. Spinner, being duly sworn, deposes and states as follows:

1.      I am a Supervisory Border Patrol Agent with the United States Department of Homeland Security ("DHS"), United States Border Patrol ("BP"). I have been so employed since May 5, 2008.

2.      As a part of my duties at BP, I have investigated violations of the Immigration and Nationality Act and other violations of the United States Code, including, Title 8, United States Code, Sections 1324, 1325, and 1326.

3.      I make this affidavit in support of a Criminal Complaint charging Sergio Eduardo AGUIRRE-Soto with violating Title 8, United States Code, Section 1324(a)(1)(A)(ii), which prohibits knowingly transporting or attempting to transport or move aliens within the United States in furtherance of such violation of law.

4.      The statements in this affidavit are based upon my own knowledge, my review of BP's official records, and upon information that I obtained from other law enforcement officers involved with this investigation. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included every fact known to me concerning this investigation. I have set forth only facts that I believe are necessary to establish probable cause for the violation stated above.

5.      On December 2, 2023, Border Patrol Agent (BPA) Graham Whalen and BPA Jacob Henderson were working their assigned duties in Jefferson County, New York, as part of the WIB ASU. While patrolling the area of Philadelphia, NY, BPA Whalen and BPA Henderson received information that a 2014 Dodge Challenger bearing Ohio license plate KFB9385 was traveling southbound from Canton, New York on State Route (SR) 11B.

*United States of America v. Sergio Eduardo AGUIRRE-Soto*

6.    ASU received information that the car fit current Tactics, Techniques, and Procedures (TTPs) for vehicles being used for migrant smuggling. SR11B is a prevalent route used by migrant smugglers to transport individuals who cross the international border illegally. WIB ASU has apprehended numerous migrant smuggling cases that utilized SR11B since November of 2022 when the WIB ASU was formed. In each event, the vehicles had travelled long distances towards the U.S/Canada International Boundary, spent a short amount of time, and made a quick turnaround to start travelling back southbound.

7.    Further information received before the vehicle stop indicated the Challenger had traveled east from Erie, New York around noon of December 1, 2023, and continued north on Interstate 87 toward Schroon Lake, New York. It is common that smugglers use this route to go north towards the United States/Canada international border. The Challenger then made a quick trip near the international border and began to go south on SR-11. Smugglers use this route because it is the quickest way to reach Interstate 81. It is also a known pick-up location for alien smugglers based on prior investigations. Smugglers commonly use these locations to illegally cross people and contraband into the United States because of its remote and rural landscape and being directly south of the large metropolitan city of Montreal, Canada. Prior arrests data, post arrest interviews, and intelligence information indicate many Mexican citizens will fly into the Montreal airport from Mexico with the intention of entering the United States illegally.

8.    Record checks on KFB9385 revealed the registered owner of the vehicle was Sergio AGUIRRE-Soto out of, Perry, Ohio. The distance between Perry, Ohio and Canton, NY is approximately 423 miles. ASU agents observed the vehicle as it was passing south on State Route 11 through Philadelphia, New York and heading towards Interstate 81.

9.    On December 2, 2023, at approximately 2:00 a.m., BPA Whalen observed the Challenger bearing Ohio license plate KFB9385 on SR11 southbound near Philadelphia, New

*United States of America v. Sergio Eduardo AGUIRRE-Soto*

York. BPA Whalen observed multiple people inside the vehicle as it passed by his location in Philadelphia, New York. Based on observations and prior intelligence information received, BPA Whalen and BPA Henderson activated their emergency lights and sirens and conducted a vehicle stop.

10.     BPA Whalen approached the vehicle and observed three male individuals in the back seat sitting on top of each other. BPA Whalen also observed a female subject sitting in the front passenger seat. BPA Whalen identified himself as a United States Border Patrol Agent and questioned the driver as to his citizenship. The driver, later identified as Sergio Eduardo AGUIRRE-Soto (AGUIRRE), stated that he was a Mexican citizen but is a permeant resident of the United States. The three subjects in the back seat were later identified as Ismael RAMIREZ-Montes (RAMIREZ), Carlos RAMIREZ-Villalobos (RAMIREZ-Villalobos), and Samuel SANCHEZ-Castellanos (SANCHEZ).

11.     BPA Whalen asked AGUIRRE how he knew the people in the backseat. He said he did not know them. BPA Whalen then began to perform an immigration interview on all subjects in the vehicle. RAMIREZ, RAMIREZ-Villalobos, and SANCHEZ each admitted to being citizens of Mexico and did not have documents to enter or remain in the United States legally. Each subject also admitted that they were illegally present in the United States. The front passenger was later identified as Violeta RAMIREZ-Villalobos. Violeta RAMIREZ-Villalobos admitted that she is a citizen of Mexico and did not have documents to enter/remain in the United States legally. Violeta RAMIREZ-Villalobos also admitted that she is illegally present in the United States. After the three subjects in the backseat exited the vehicle, BPA Whalen observed a small child in a car seat. Violeta RAMIREZ-Villalobos said the child was hers and that her child is a Mexican citizen and did not have documents to enter/remain in the United States legally. It also was ascertained that RAMIREZ-Villalobos is the brother of Violeta RAMIREZ-Villalobos. At approximately 2:14

*United States of America v. Sergio Eduardo AGUIRRE-Soto*

a.m., BPA Whalen placed the subjects under arrest for being in the United States illegally and arranged for transportation back to the Wellesley Island Station.

12.     At approximately 8:16 a.m., on December 2, 2023, SANCHEZ was read his Miranda rights by BPA Evan Drake and witnessed by Border Patrol Agent-Intelligence (BPA-I) Josh. SANCHEZ acknowledged that he understood his rights and agreed to answer questions without the presence of an attorney. Interpreted by Ad Astra interpreter ID: 83998909. SANCHEZ stated he was born in Mexico and is a citizen of Mexico. SANCHEZ stated he flew in an airplane from Mexico to Montreal, Canada on November 7, 2023, and that he applied for a visa-exempt Electronic Travel Authorization (ETA) for his entry into Canada. SANCHEZ stated when he arrived in Montreal, Canada he was staying in an apartment with a friend. SANCHEZ stated he wanted to illegally cross into the United States from Canada to find work. SANCHEZ stated they were picked up at a metro station in Montreal, Canada by a truck around 6:00 p.m. on December 1, 2023. SANCHEZ stated when they were dropped off near the border and walked for two hours to cross the border. SANCHEZ stated that a man named "Roberto" from North Carolina sent everyone a location on their phones of where to cross. SANCHEZ stated everyone was picked up in the United States by a large older man in a black truck. SANCHEZ stated everyone was then dropped off at a gas station where they met another vehicle and boarded that vehicle. SANCHEZ stated the vehicle they boarded was grey with two doors and that it was the same vehicle they were pulled over in. SANCHEZ positively identified AGUIRRE as the driver of the vehicle via photograph. SANCHEZ stated he paid "Roberto" a total of 30,000 Mexican Pesos to cross the border illegally.

13.     At approximately 10:27 a.m., on December 2, 2023, AGUIRRE was read his Miranda Rights by BPA-I Josh Todd and witnessed by BPA-I Peter Lombardi. AGUIRRE acknowledged and that he understood his rights and refused to answer questions without an

attorney present. The interview was concluded at 10:31 a.m. Interpreted by Ad Astra interpreter ID: 16424197.

14.     At approximately 10:44 a.m., on December 2, 2023, RAMIREZ was read his Miranda rights by Border Patrol Agent-Intelligence BPA-I Josh Todd and witnessed by BPA-I Peter Lombardi. RAMIREZ acknowledged that he understood his rights and agreed to answer questions without the presence of an attorney. Interpreted by Ad Astra interpreter ID: 68001973 and 68002679. RODRIGUEZ stated that he was born in Mexico and does not have documentation to enter the United States legally. RODRIGUEZ stated he flew in an airplane from Mexico to Toronto, Canada on November 8, 2023, and then travelled in a bus from Toronto, Canada to Montreal, Canada. RODRIGUEZ stated he crossed into the United States to find work. RODRIGUEZ stated he had help from "Jorge" to cross the border. RODRIGUEZ stated that "Jorge" lives in Canada. RODRIGUEZ stated he stayed in "Jorge's" apartment in Canada and then travelled to the border area by vehicle. RODRIGUEZ stated they were given a group location on their phones of where to cross the border and they walked in the woods for an hour and a half. RODRIGUEZ stated that "Jorge" gave them instructions to come out when they saw a taxi or vehicle. RODRIGUEZ stated the vehicle was a van or a pickup truck. RODRIGUEZ stated they travelled for approximately forty to fifty minutes in the vehicle before arriving at a gas station. RODRIGUEZ stated they waited ten minutes at the gas station and another vehicle that he positively identified via photograph as a grey dodge Challenger showed up to pick them up. RODRIGUEZ also positively identified AGUIRRE via photograph as the driver of the vehicle. RODRIGUEZ stated he knows AGUIRRE from their hometown in Mexico. RODRIGUEZ stated there were six people total in the vehicle. RODRIGUEZ stated he paid "Jorge" $2,500.00 when he arrived in Montreal, Canada and that the money was for his illegal crossing of the border from Canada to the United States. RODRIGUEZ stated their intended destination was Ohio.

*United States of America v. Sergio Eduardo AGUIRRE-Soto*

RODRIGUEZ stated that AGUIRRE knew he had crossed the border illegally. RODRIGUEZ stated that AGUIRRE knew that he crossed the border as a Mexican citizen. RODRIGUEZ stated that AGUIRRE agreed to pick him up after he crossed the border illegally and to take him to Ohio.

15.     Nationals and citizens of Mexico are required to apply for a visa if they seek to enter the United States. Mexican citizens who are issued a visa by the United States government are required to present the visa and the person's passport to an immigration official at a Port of Entry as he or she seeks admission into the United States. RAMIZEZ and SANCHEZ do not possess a valid visa and do not appear to have applied for one. If either had presented himself to a Port of Entry and asked permission to enter the United States, each would have been denied admission.

ATTESTED TO BY THE APPLICANT IN ACCORDANCE WITH RULE 4.1 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE


_____
Gerard A. Spinner

I, the Honorable Andrew T. Baxter, United States Magistrate Judge, hereby acknowledge that his affidavit was attested by the affiant by telephone on December 2, 2023, in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

_____
Hon. Andrew T. Baxter
U.S. Magistrate Judge

## ATTACHMENT A

The property to be searched is an Apple I-phone 15 (the "Device") and sim card bearing

number 8901260208711270357329.00, both of which are depicted below:



The Device and sim card are currently in the custody of U.S. Border Patrol at 45764

Landon Road, Wellesley Island, NY 13640.

This warrant authorizes the forensic examination of the Device and sim card for the

purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

### **Particular Things to be Seized**

1.        All records on the Device and sim card described in Attachment A that relate to violations of 8 U.S.C. § 1324(a)(1)(A)(ii) (transportation or movement of aliens within the United States), (a)(1)(B)(i) (conduct for purpose of commercial advantage or private financial gain), (a)(2) (bringing an alien to the United States), (a)(2)(B)(ii) (conduct for purpose of commercial advantage or private financial gain) and involve Sergio Eduardo Aguirre-Soto since December 1, 2023, including:

   a.   Contacts and/or communications between the user of the Device and any person concerning the bringing of aliens to the United States from Canada and/or the transportation of any aliens inside the United States to another location within the United States;

   b.   Records concerning the payment or receipt of money for bringing to the United States or transporting within the United States any aliens;

   c.   Photographs or recordings of any pickup locations, rendezvous points, and/or crossing locations used by any aliens and/or anyone bringing them to and/or transporting them within the United States;

   d.   Photographs or recordings of any aliens or others involved in the bringing to the United States and/or transportation within the United States of any aliens;

   e.   Evidence of intent to bring aliens to the United States and/or to transport aliens within the United States and/or of the bringing into the United States or transportation within the United States of individuals with a reckless disregard for

whether such people were aliens that had come to, entered, or remained in the United States in violation of law, or had no received prior authorization to come to, enter, or reside in the United States;

f.   Location information reflecting the route of travel for any trip related to the bringing to the United States from Canada any aliens and/or the transportation within the United States of any aliens;

g.   Evidence of the user(s) of the Device and/or who controlled the Device related to the bringing of aliens to the United States and/or the transportation of aliens within the United States;

2.   As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.